FILED

'13 MAY 20 PM 12: 02

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA.

 DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NGHIEM DANG, | CASE NO. 11cv1955-BTM(KSC) |
| Petitioner, | **REPORT AND RECOMMENDA-TION RE PETITION FOR WRIT OF HABEAS CORPUS** |
| vs. | |
| L. S. McEWAN, Warden, | |
| Respondent. | |

Petitioner Nghiem Dang, a state prisoner, has filed a Petition for Writ of Habeas Corpus ("Pet'n") pursuant to Title 28, United States Code, Section 2254, challenging his conviction in *People of the State of California v. Nghiem Duc Dang*, San Diego Superior Court Case No. SCD 205895. [Doc. No. 1, Pet'n., at p 1.]

This Report and Recommendation is submitted to United States District Judge Barry T. Moskowitz pursuant to Title 28, United States Code, Section 636(b) and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California. Based on the moving and opposing papers, and for the reasons outlined below, this Court recommends that the Petition be DENIED.

## *PROCEDURAL BACKGROUND*

Petitioner was convicted by a jury of "three counts of sexual intercourse with a child 10 years or younger (Pen. Code, § 288.7, subd. (a)),[1] 15 counts of committing a

---

[1] Unless otherwise noted, all statutory references are to the California Penal Code.

1  lewd act on a child (§ 288, subd. (a)), and six counts of oral copulation with or sexual
2  penetration of a child 10 years or younger (§ 288.7, subd. (b)). The jury also found true
3  the allegations that [petitioner] committed 13 of the 15 lewd acts during the
4  commission of a burglary with the intent to commit a lewd act on a child under the age
5  of 14 years in violation of section 288, subdivision (a), within the meaning of section
6  667.61, subdivisions (a), (c), and (d)." [Lodgment No. 9.]

7       On direct appeal to the California Court of Appeal, petitioner raised some claims
8  that are relevant to the current action. He argued his convictions were unfair or
9  unconstitutional, because: (1) the court erred by not conducting a bias inquiry of a
10  juror who made certain comments [Juror No. 12]; (2) the court erred by not giving a
11  unanimity instruction regarding the Section 667.61 allegations; and (3) his counsel
12  provided ineffective assistance by pursuing an invalid defense theory.[2] [Lodgment No.
13  9, at p. 2; Lodgment Nos. 1-9.]  Petitioner's conviction was affirmed by the California
14  Court of Appeal in an unpublished opinion. [Lodgment No. 9, at p. 35.] Petitioner then
15  filed a Petition for Review in the California Supreme Court. [Lodgment No. 10.] The
16  California Supreme Court summarily denied the petition without citation of authority.
17  [Lodgment No. 11.]

18       Next, petitioner filed a Petition for Writ of Habeas Corpus in the San Diego
19  County Superior Court that included some new arguments that were not raised on
20  direct appeal. [Lodgment No. 12, at pp. 6-35.] Petitioner argued that his conviction is
21  unfair or unconstitutional because: (1) the trial court did not conduct a bias inquiry of
22  Juror Nos. 3, 4, and 15; and (2) he is actually innocent under Section 288.7 as the
23  victim was more than ten years of age at the time the offenses occurred. [Lodgment No.
24  12, at p. 7.] The San Diego Superior Court denied this Petition on September 13, 2011.
25  Petitioner then raised the same issues in a Habeas Petition in the California Court of
26  Appeal, which denied the Petition on October 25, 2011. [Lodgment Nos. 14, 15.]

27  _____

28       [2]  The ineffective assistance of counsel claims was not included in
petitioner's opening brief on appeal but was raised later in supplemental briefing.
[Lodgment Nos. 6-8.]

1  Finally, petitioner exhausted his state court remedies as to these issues by filing a
2  Habeas Petition in the California Supreme Court.  The California Supreme Court
3  summarily denied the Petition on December 14, 2011. [Lodgment Nos. 16, 17.] After
4  exhausting his state court remedies, petitioner filed his Petition for Writ of Habeas
5  Corpus in this Court raising the issues outlined above.

6                                  ***FACTUAL BACKGROUND***

7           This Court gives deference to state court findings of fact and presumes them to
8  be correct; petitioner may rebut the presumption of correctness, but only by clear and
9  convincing evidence. 28 U.S.C. § 2254(e)(1).  The following statement of facts is
10 therefore taken from the California Court of Appeal's reasoned opinion denying
11 petitioner's direct appeal of his conviction:

12          "N.S. was born in 1996.  In 2005, her father became friends with [petitioner].
13 During the night of December 2, 2006, her parents saw her climbing through her
14 bedroom window that led to the enclosed patio room where [petitioner] was sleeping.
15 When stopped by her parents, N.S. stated [petitioner] had asked her to come and sleep
16 on the couch with him.  On the request of N.S.'s father, [petitioner] left their home.

17          On December 27, N.S.'s father learned [petitioner] had given N.S. a cellular
18 telephone. [Petitioner] had sent N.S. several text messages on that telephone, including
19 one expressing his love for her and another calling her 'wifey.'  N.S.'s father then
20 contacted police.  Police took statements from N.S. and her father and impounded her
21 cellular telephone.

22          On January 4, 2007, Laurie Fortin, a Children's Hospital forensic interviewer,
23 interviewed N.S.  N.S. told Fortin that [petitioner] would crawl through her bedroom
24 window, wake her up, and ask her to join him in the patio room where he slept when
25 he spent the night at N.S.'s home.  As they lay together, [petitioner] would rub her face,
26 back, and thigh. [Petitioner] would kiss her on the cheek and tell her how soft or
27 smooth her skin was.
28 / / /

1    On April 12, San Diego Police Detectives Donna Eastep and Timothy Williams

2  went to N.S.'s home and had her telephone [petitioner].  Before the telephone call,

3  Eastep believed [petitioner's] conduct was limited to touching and kissing N.S.

4  However, after listening to the telephone conversation, Eastep suspected other contact

5  had occurred.  She questioned N.S. further and had her telephone [petitioner] a second

6  time.

7    Williams then went to [petitioner's] house and arrested him. [Petitioner] initially

8  denied having sexual contact with N.S.  However, he eventually admitted having

9  telephone sex with her and then admitted having vaginal sex with her.  He further

10  admitted he digitally penetrated her and had her orally copulate him.

11    N.S. was examined by a nurse for evidence of sexual abuse.  The nurse found a

12  cleft on N.S.'s hymen, indicating it may have been torn.  That injury was highly

13  consistent with sexual assault (i.e., a penis entering the vaginal area).

14    On February 19, 2008, Fortin interviewed N.S. again.  N.S. told her [petitioner]

15  had vaginal sex with her, had sodomized her, and had her orally copulate him.  She also

16  stated Dang would telephone her in the middle of the night to tell her he was coming

17  over.  He would then enter her house through a patio window, climb through her

18  bedroom window, and wake her up. He then had her go through that bedroom window

19  to the patio room where the sexual conduct occurred on a couch.

20    On February 19, a physician examined N.S. and found two complete clefts and

21  a deep notch in her hymen, which injuries were consistent with multiple occasions of

22  penile-vaginal penetration.  Also, testing conducted by a police criminalist showed

23  [petitioner's] DNA was consistent with that recovered from semen found on N.S.'s

24  comforter.  The probability of finding an individual from the Vietnamese population

25  with the same DNA types was one in 75 quintillion.

26                    * * * *

27  ///

28  ///

1    At trial, the prosecution presented testimony of N.S., police officers, and other
2  witnesses substantially as described above.  N.S. testified regarding the specific acts
3  that occurred between [petitioner] and her.

4    In his defense, [petitioner] testified he used drugs and alcohol and would often
5  hallucinate.  When he used methamphetamine, ecstasy, and alcohol together, he would
6  feel especially amorous and would be in a dream-like state.  Although he admitted
7  having sexual contact with N.S., he testified he sometimes did not know it was N.S.
8  and instead thought she was 'Marty,' his female friend.  Ronald Siegel, Ph.D., testified
9  ecstasy can cause users to hallucinate and feel an intense bond with others.

10    The jury found [petitioner] guilty on all 24 counts and found true all of the
11  enhancement allegations.  The trial court sentenced [petitioner] to a total prison term
12  of 75 years to life." [Lodgment No. 9, at p. 2-5.]

13                          ***DISCUSSION***

14  **A.    _Standard of Review_.**

15    Federal habeas corpus relief is available only to those who are in custody in
16  violation of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  "A
17  federal court may not issue the writ on the basis of a perceived error of state law."
18  *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  "[A] mere error of state law is not a denial
19  of due process."  *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) (internal quotations
20  omitted).

21    This Petition is governed by the provisions of the Antiterrorism and Effective
22  Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 327 (1997).
23  Under AEDPA, a habeas petition will not be granted with respect to any claim
24  adjudicated on the merits by the state court unless that adjudication: (1) resulted in a
25  decision that was contrary to, or involved an unreasonable application of clearly
26  established Federal law; or (2) resulted in a decision that was based on an unreasonable
27  determination of the facts in light of the evidence presented at the state court
28  proceeding.  28 U.S.C. § 2254(d)(1)&(2); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).  For

1   purposes of section 2254(d), "clearly established Federal law" means "the governing
2   legal principle or principles set forth by the Supreme Court at the time the state court
3   renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

4           In deciding a state prisoner's habeas petition, a Federal Court is not called upon
5   to decide whether it agrees with the state court's determination; rather, the Court
6   applies an extraordinarily deferential review, inquiring only whether the state court's
7   decision is objectively unreasonable. *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003);
8   *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). Federal habeas relief may be
9   granted under the "contrary to" clause of section 2254 if the state court applied a rule
10  different from the governing law set forth in Supreme Court cases, or if it decided a
11  case differently than the Supreme Court on a set of materially indistinguishable facts.
12  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  The focus of inquiry under the "contrary to"
13  clause is "whether the state court's application of clearly established federal law is
14  objectively unreasonable." *Id.*  "[A]n unreasonable application is different from an
15  incorrect one." *Id.*  In other words, federal habeas relief cannot be granted simply
16  because it concludes based on its own independent judgment that the state court
17  decision is erroneous or incorrect. *Id.*

18          Where there is no reasoned decision from the state's highest court, Federal
19  Courts "looks through" to the underlying appellate court decision and presume it
20  provides the basis for the higher court's denial of a claim or claims.    *Ylst v.*
21  *Nunnemaker*, 501 U.S. 797, 805-806 (1991).  If the state court does not provide a
22  reason for its decision, the Federal Court must conduct an independent review of the
23  record to determine whether the state court's decision is objectively unreasonable.
24  *Crittenden v. Ayers*, 624 F.3d 943, 947 (9th Cir. 2010).  To be objectively reasonable,
25  a state court's decision need not specifically cite Supreme Court precedent. "[S]o long
26  as neither the reasoning nor the result of the state-court decision contradicts [Supreme
27  Court precedent]," the state court's decision will not be "contrary to clearly established
28  Federal law." *Early v. Packer*, 537 U.S. 3, 8 (2002).

1   **B.    _Juror Bias._**

2          Petitioner argues that his right to a fair trial was violated because the trial court

3   did not take appropriate action when it received information indicating Juror Nos. 3,

4   4, 12, and 15 were biased.  Referring to several comments made by the trial court to the

5   attorneys during trial, petitioner complains that the trial was long with many delays and

6   this resulted in an atmosphere of frustration and animosity among the jurors.  Then,

7   Juror Nos. 3 and 12 openly expressed frustration and animosity towards the trial

8   process, and the trial court should have but did not make an inquiry to ensure they

9   could decide the case fairly.  Second, petitioner argues that Juror No. 4 should have

10  been dismissed when the trial court learned that she knew several of the prosecution's

11  witnesses.  Third, petitioner contends that the trial court should have made a bias

12  inquiry when it learned that Juror No. 15 may have recognized the victim's father.

13  Petitioner also argues he was prejudiced by the cumulative effect of these alleged errors

14  by the trial court and his counsel's failure to protect his interests in these matters.

15          Due process guarantees criminal defendants a trial by an impartial jury.  _Irwin_

16  _v. Dowd_, 366 U.S. 717, 722 (1961).  "Due process means a jury capable and willing to

17  decide the case solely on the evidence before it, and a trial judge ever watchful to

18  prevent prejudicial occurrences and to determine the effect of such occurrences when

19  they happen."  _Smith v. Phillips_, 455 U.S. 209, 217 (1982).  "[T]he remedy for

20  allegations of juror partiality is a hearing in which the defendant has the opportunity

21  to prove actual bias."  _Id._ at 215.  However, a hearing "with all interested parties" is

22  only necessary to satisfy due process if the trial court is presented with a substantial

23  question of juror bias.  _Id._ at 217.[3]  According to the Ninth Circuit,[4] "'an evidentiary

24

---

25      [3]    By contrast, the Supreme Court has indicated that due process does require
    notice and a hearing in every case where there is evidence of jury tampering, and the
26  Government has the burden to show that improper contact with a juror was harmless.
    _Remmer v. United States_, 347 U.S. 227, 229 (1954).
27

    [4]    "Ninth Circuit precedent may be persuasive authority for purposes of
28  determining whether a particular state court decision is an unreasonable application of
    Supreme Court law, and may also help us to determine what law is clearly established."

1  hearing is not mandated *every* time there is an allegation of jury misconduct or bias.

2  Rather, in determining whether a hearing must be held, the court must consider the

3  content of the allegations, the seriousness of the alleged misconduct or bias, and the

4  credibility of the source.' [Citations omitted.]" *Tracey v. Palmateer*, 341 F.3d 1037,

5  1044 (9th Cir. 2003).  Another relevant consideration is whether either party requested

6  a hearing to investigate evidence of juror bias. *Sims v. Rowland*, 414 F.3d at 1154,

7  1156.

8       On direct appeal, the California Court of Appeal concluded no hearing by the

9  trial court was required with respect to Juror No. 12, because the comments made were

10 not enough to support a reasonable inference that there might be good cause for

11 removal. [Lodgment No. 9, at 13-18.]  Petitioner raised his remaining claims of juror

12 bias in his state habeas petitions. The California Court of Appeal rejected these claims,

13 because petitioner "failed to include any supporting documentation, including

14 transcript pages he cites in the petition." [Lodgment No. 15, at p. 1-2.] The California

15 Supreme Court then rejected these claims, apparently without comment. [Lodgment

16 No. 17.]

17      In support of his claims concerning juror bias, petitioner refers this Court to

18 portions of the trial transcript where the trial court and the attorneys discussed the

19 circumstances pertaining to Juror Nos. 3, 4, 12, and 15.  These discussions and the

20 circumstances pertaining to each of these jurors is outlined separately below.

21  **1.  *Juror No. 3*.**

22      During trial, on the afternoon of April 22, 2008, the trial court said at the end of

23 the day, "All right.  Well, we'll forge ahead, then, at 9:30 and get that done. . . ."

24 [Lodgment No. 2, Tr. at p. 5776.] Defense counsel then said on the record that Juror

25 No. 3 "was shaking his head" when the trial court indicated it was time to adjourn for

26 the day and start again the next morning at 9:30 a.m. Defense counsel also said, "I

27

28 *Robinson v. Ignacio*, 360 F.3d 1044, 1057 (9th Cir. 2004) (internal quotations omitted).
However, habeas relief can only be justified based on decisions by the United States
Supreme Court. *Sims v. Rowland*, 414 F.3d 1148, 1152 (9th Cir. 2005).

11cv1955-BTM(KSC)

1   don't know if that was anxious or anger since we're starting late. I just get the

2   impression – I wanted the Court to know that. He's not too thrilled." [Lodgment

3   No. 2, Tr. at p. 5776.] The following colloquy then took place on the record:

4
5   THE COURT: Okay. Well, I – I think generally he's – I mean, it's been
    apparent to him, I think reasonably, that it's been apparent to him at least
    for the last few days that he was not going to Sacramento tomorrow. I
6   mean, he asked me I think it was on recess yesterday, I think he said, you
    know, ' Can you tell me, if there [are] any other times we're going to have
7   off the rest of this week?' And I said, 'No. I expect we're forging ahead,
    we're dedicated to finish this trial. We're going to be in session I think
8   all the rest of this week.' So I think if he didn't understand that before, I
    think he certainly understood this afternoon he wasn't going to
9   Sacramento tomorrow. And I think he reasonably understood that before
    because I made it clear to him, I think, that you better be getting
10  somebody . . . else ready to make that presentation.

11  Now, he may have held out some hope that he might still have been able
    to go. But, ah, that was – as I understand it, that was – they were going
12  to fly up either – I don't remember whether he said what time that hearing
    was, but I – it was going to be at least – I mean, I don't see the fact we're
13  starting at 9:30 rather than 9:00 – he wasn't going to get to go to
    Sacramento, in any event.
14
15  So I'm not sure – I mean, he may just think we have sort of banker's
    hours, as they say. But that's why I try to be clear that it's other matters.
16  We're not just sitting around, you know, not doing anything. We have
    other non-related matters to attend to.

17  So I – I didn't see that reaction on his part; but, ah, he's entitled to his
    feelings in that regard, I guess.
18
19  [Defense Counsel]: Very well.

20  THE COURT:  . . . Well, I appreciate your pointing that out to me.
    Okay. Anything else, then, on the record?

21  [Defense Counsel]: No, your Honor.

22  [Lodgment No. 2, Tr. at pp. 5777-5778.]

23      Based on the record, it is apparent that no due process violation occurred with

24  respect to Juror No. 3. One brief incident of head shaking by a juror is simply not

25  enough to raise a substantial question of juror bias, particularly when it is apparent

26  based on the context of the record that the juror is only expressing some frustration

27  with the trial process. There is nothing about the circumstances of this head shaking

28  incident to indicate Juror No. 3 was biased against petitioner or could not remain fair

1   and impartial because the trial schedule resulted in some personal inconvenience.

2   Neither party expressed any concern that Juror No. 3 was biased based on the head

3   shaking incident and neither party requested an admonition to the jury or a hearing to

4   investigate any potential for juror bias.   Therefore, it was not contrary to, nor an

5   unreasonable application of, clearly established Supreme Court law for the state courts

6   to reject petitioner's due process claim that the trial court violated his right to due

7   process when it failed to conduct a bias inquiry or hearing as to Juror No. 3.   As a

8   result, it is RECOMMENDED that the District Court DENY petitioner's claim that his

9   right to due process was violated because the trial court did not conduct a bias inquiry

10  or hearing during trial to ensure that Juror No. 3 was not biased against petitioner.

11      **2.   *Juror No. 4.***

12      On the first day of trial, the prosecutor advised the trial court out of the presence

13  of the jury that one of the investigating officers recognized Juror No. 4 and had seen

14  her at work. [Lodgment No. 2, Tr., at pp. 4020-4021.] However, when asked during

15  jury voir dire, Juror No. 4 had not indicated she recognized the investigating officer.

16  Therefore, when the jurors returned to the courtroom, the trial court reiterated that they

17  should make a disclosure if they recognized any of the witnesses.   [Lodgment No. 2,

18  Tr., at pp. 4020-4023.]   The trial court said, "If that occurs, let us know that just so we

19  can be sure that from your standpoint that recognition that you now have is not going

20  to affect your ability to be fair and impartial.   That's our concern."   [Lodgment No. 2,

21  Tr., at p. 4024.]   Thereafter, Juror No. 4 let the bailiff know that she recognized the

22  investigating officer. [Lodgment No. 2, Tr., at p. 4025.]   The trial court then held a

23  hearing to determine whether there was any concern of bias. [Lodgment No. 2, Tr., at

24  pp. 4025-4026.]

25      During the hearing, it was revealed that Juror No. 4 is a code compliance officer

26  and works at police headquarters, but the type of work she does is separate from the

27  police officers who work on criminal cases.   They do not normally work together on

28  cases.   She recognized other witnesses in addition to the investigating officer.

1  However, she stated that her recognition of these individuals would not affect her
2  ability to be fair and impartial. She had not socialized with any of these individuals.
3  She had not known them on a personal level and only knew the names of two. She also
4  did not know their work, had not discussed any cases with them, and had no opinion
5  or knowledge about their work or work ethics. [Lodgment No. 2, Tr., at pp. 4026-
6  4028.] At the end of the hearing, neither party requested the disqualification of Juror
7  No. 4. [Lodgment No. 2, Tr., at pp. 4029-4030.]

8       With respect to Juror No. 4, petitioner received all the process that was due under
9  the circumstances. When the trial court became aware of facts raising a question of
10  juror bias, a special hearing was held. Both parties had an opportunity to question
11  Juror No. 4. At the hearing, no facts were discovered indicating Juror No. 4 was biased
12  against petitioner and could not be impartial. After Juror No. 4 was questioned on the
13  record, neither party requested removal of Juror No. 4 based on a claim of actual bias,
14  which is the standard for disqualification of a juror. *Smith v. Phillips*, 455 U.S. at 215
15  (stating that "the remedy for allegations of juror partiality is a hearing in which the
16  defendant has the opportunity to prove actual bias"). Since there was no evidence of
17  actual bias as to Juror No. 4, it was not contrary to, or an unreasonable application of,
18  clearly established Supreme Court law for the state courts to reject petitioner's claim
19  that Juror No. 4 should have been dismissed from the jury panel. As a result, it is
20  RECOMMENDED that the District Court DENY petitioner's claim that his right to due
21  process was violated because the trial court did not disqualify Juror No. 4 based on
22  actual bias.

23       **3.  _Juror No. 12_.**

24       On the afternoon of May 1, 2008, after the case was closed to evidence but
25  before closing arguments, the trial court made a disclosure on the record to counsel
26  about Juror No. 12 outside the presence of the jury.

27       THE COURT: . . . [B]efore we put any final discussions on the matter of
       the instructions on the record, let me inform you just so you're informed
28       – I'm not suggesting that we take any particular action, but we can discuss
       it as you want to. But so you are informed, this morning when the clerk

- 11 -

1    went out to advise the jurors, and that was probably 9:40 or something
     like that because they were told to be here around 9:30, and somewhere
2    around I think 9:45 probably she went out to tell them it would be another
     15 minutes, and at that time Juror No. 12, who is our post doc researcher
3    who, it's been pretty apparent from his demeanor during the trial, that he
     thinks this is a waste of time and he has better things to do, was heard to
4    say by the clerk 'are they doing anything productive in the courtroom,'
     and she assured him that we were.  We were working on the case, so they
5    went off and did whatever they did.

6    Most of the other jurors probably heard what he said because they were
     all assembled outside.  Later on then when – this was probably about
7    11:30 or something thereabouts, when she went out to tell them to come
     back at 1 o'clock, same Juror No. 12 was heard to make a comment, as I
8    understand it, the gist of which, the essence of which was that he was
     rather upset or perplexed or bemused about how three highly-educated
9    individuals, meaning the court and you two, how three highly-educated
     individuals could be so incompetent.  And that remark was perhaps heard,
10   probably heard by at least some of the other jurors and, of course, she
     didn't respond to that obviously.
11
     So I just wanted you to be advised.  I'm not suggesting – I suppose that
12   comes as any surprise that jurors could be in that frame of mind now, but
     he was the one who verbalized that.  So I don't know what, if anything,
13   you suggest we do about that at this point.  I want you to be advised so
     you have that information.
14

15   [Lodgment No. 2, Tr., at pp. 7208-7209.]

16        As the California Court of Appeal observed when reviewing petitioner's direct

17   appeal, Juror No. 12's comments merely reflect impatience and frustration with the trial

18   process as guided by the trial court and the attorneys.  The record shows that jury voir

19   dire began on April 8, 2008. [Lodgment No. 2, Tr., at p. 3241.] Following preliminary

20   instructions to the jury and the prosecutor's opening statement, evidence presentation

21   began on the afternoon of April 11, 2008, and Juror No. 12's comments were made on

22   the afternoon of April 22, 2008.  [Lodgment No. 2, Tr., at pp. 4022, 4030.] Thus, the

23   trial was a lengthy one, and some impatience and frustration would not be uncommon

24   under the circumstances. Juror No. 12's comments are not, however, enough to suggest

25   he was biased against defendant and would not be able to remain impartial, deliberate

26   the case fairly, or follow the law.  Neither party expressed any concerns about Juror No.

27   12's comments and neither party requested a hearing to investigate any potential for

28   juror bias.

1    In sum, there are insufficient facts to raise a substantial question of bias as to
2  Juror No. 12, so due process did not require the trial court to conduct a special hearing
3  and inquiry of Juror No. 12. Therefore, the state court's rejection of petitioner's claim
4  as to Juror No. 12 did not result in a decision that was contrary to, or an unreasonable
5  application of, clearly established Supreme Court law.   As a result, it is
6  RECOMMENDED that the District Court DENY petitioner's claim that his right to due
7  process was violated because the trial court did not conduct a hearing on inquiry during
8  trial to ensure that Juror No. 12 was not biased against petitioner.

9        **4.    _Juror No. 15_.**

10    Petitioner contends the trial court violated his right to due process because it
11  should have conducted a bias hearing when Juror No. 15 indicated he might recognize
12  the victim's father. In this regard, the following discussion took place on the record
13  during trial:

14    The Court: . . . Anything on the record out of the presence of the jury
      before we take our break?

15    [Defense counsel]: I didn't – perhaps I recall something that didn't
16    happen because there were a lot of jurors last week that said they did not
      recognize somebody, but I thought when you ended there was another
17    juror that had said that –

18    The Court: Juror No. 15 thought maybe I think it was may recognize the
      witness, yes.

19    [Defense counsel]: Oh, okay. I did not know if we might at some time
20    inquire. I thought maybe we forgot.

21    The Court: Well, we didn't. He's gone and we didn't.

22    [Prosecutor]: Was it a witness or was it Juror No. 15?

23    The Court: Recognized the father I thought. He thought he recognized
      the father. He thought he looked familiar. I didn't see a need to inquire
24    and you didn't ask, so he's gone.

25    [Prosecutor]: All right.

26  [Lodgment No. 2, Tr., at p. 4184-4185.]

27    Based on a review of the record, it is clear that petitioner does not have a valid
28  due process claim as to Juror No. 15. As respondent contends, the record shows that

1  Juror No. 15 was not empaneled as a member of the jury. [Lodgment No. 2, Tr., at p.
2  4185.]  It is therefore irrelevant whether Juror No. 15 recognized the victim's father,
3  and the trial court had no obligation to make any further inquiry on this issue.  Under
4  these circumstances, it was not contrary to, nor an unreasonable application of, clearly
5  established Supreme Court law, for the state courts to reject petitioner's claim.  It is
6  therefore RECOMMENDED that the District Court DENY petitioner's claim that his
7  right to due process was violated when the trial court failed to conduct a hearing to
8  determine whether Juror No. 15 was biased based on his recognition of the victim's
9  father.

10        **5.   *Cumulative Error.***

11        Petitioner also contends his right to due process was violated and he was
12  prejudiced by the cumulative effect of the trial court's repeated failure to act on
13  information related to potential juror bias and by his trial attorney's failure to protect
14  his rights against the trial court's inaction.  However, where no error of constitutional
15  magnitude occurred, cumulative prejudice is not possible.  *Fenenbock v. Director of*
16  *Corrections for California*, 692 F.3d 910, 913 (9th Cir. 2012). As outlined above, there
17  was no failure by the trial court or petitioner's counsel to take appropriate action with
18  respect to potential bias as to Juror Nos. 3, 4, 12, and 15, since there is nothing to
19  suggest actual prejudice could be shown.  It is therefore RECOMMENDED that the
20  District Court DENY petitioner's due process claim based on cumulative error.

21        **C.   *Jury Instructions.***

22        Under Section 667.61(a)(c)(d), also referred to as California's One Strike Law,
23  the trial court is required to impose a sentence of 25 years to life if a lewd act as
24  proscribed by Section 288(a) is committed against a child "during the commission of
25  a burglary" in violation of Section 459.  § 667.61(a)(c)(d).   In pertinent part, Section
26  459 defines burglary as entry into a house or room "with intent to commit . . . any
27  felony." §459. In this case, it was specially alleged as to Counts 2, 4, 6, 8, 10, 12, 14,
28  16, 18, 20, 21, and 22, that Section 667.61(a)(c)(d) applied because petitioner

1   committed lewd acts against the victim "during the commission of a burglary" in

2   violation of Section 459. [Lodgment No. 1, Clk's Tr., at pp. 215-222.] The jury

3   specifically found these allegations true as to each of the above-listed counts.

4   [Lodgment No. 1, Clk's Tr., Vol. 2, at pp. 215-222; Vol. 4, at p. 667-687.]

5       In his third claim for relief, petitioner argues that the trial court violated his right

6   to due process because it did not give a unanimity instruction to the jury as to the

7   Section 667.61(a)(c)(d) allegations. According to petitioner, the evidence showed two

8   separate, distinct entries. The first entry was into the victim's home and the second

9   entry was into a bedroom or other room within the victim's home where the lewd acts

10   were committed. He therefore believes the trial court should have instructed the jury

11   they must unanimously agree whether he had the required intent when he entered the

12   house or when he entered a room within the house. Without a unanimity instruction,

13   petitioner believes the jury could have disagreed as to when he had the required intent.

14   In addition, petitioner believes that the lack of a unanimity instruction made it possible

15   that the jury incorrectly believed his voluntary intoxication defense did not apply to the

16   Section 667.61(a)(c)(d) allegations. [Doc. No. 1, Pet'n, at pp. 41-46.]

17       On direct appeal, the California Court of Appeal concluded based on California

18   law that a unanimity instruction on the Section 667.61(a)(c)(d) allegations was not

19   necessary. Relying on the California Supreme Court's decision in *People v. Russo*, 25

20   Cal.4th 1124, 1132-1135 (2001),[5] the California Court of Appeal reasoned that a

21   unanimity instruction was not required because the evidence did not suggest two

22   discrete criminal events. In other words, there was nothing to suggest there was one

23

24      [5]   Under *Russo*, unanimity is not required where a discrete crime is charged but leaves room for disagreement on the theory of how the crime was committed.

25   *Russo*, 25 Cal.4th at p. 1132. "[W]here the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what

26   the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." *Id.* at 1132. "In

27   deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime,

28   or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." *Id.* at 1135.

1  burglary with felonious intent when petitioner entered the house and another burglary
2  with felonious intent when he entered the bedroom or other room in the house. Instead,
3  the evidence merely suggested two different theories as to how petitioner committed
4  the underlying burglary. Unanimity was not required because intent with entry into the
5  home and intent with entry into a room are merely two different means or theories as
6  to how petitioner committed a single discrete crime.  [Lodgment No. 9, at pp. 18-24.]

7      The applicable and clearly established Federal constitutional law on jury
8  unanimity was expressed by the United States Supreme Court in *Schad v. Arizona*, 501
9  U.S. 624 (1991).   Under *Schad v. Arizona*, "a state criminal defendant, at least in
10  noncapital cases, has no federal right to a unanimous jury verdict." *Id.* at 635 n.5.  As
11  a result, petitioner did not have a "clearly established" Federal constitutional right to
12  a unanimity instruction.  *Id.*

13      The Supreme Court in *Schad v. Arizona* also concluded that when a single crime
14  can be committed by various means, it is not necessary under Federal constitutional law
15  that the jury unanimously agree on which means were used, as long as the jury agrees
16  beyond a reasonable doubt that the crime was committed.  *Id.* at 637-639.  According
17  to the Supreme Court, state legislatures have wide latitude "to determine the
18  appropriate relationship between means and ends in defining the elements of a crime"
19  as long as a statutory definition of an offense and the means by which it may be
20  committed do not violate "fundamental fairness and rationality." *Id.* at 638, 645.  Here,
21  petitioner does not even argue that the statutory definition of burglary violates
22  "fundamental fairness and rationality." *Id.*

23      Petitioner's arguments and the facts and circumstances of this case are
24  analytically similar to those  considered and rejected by the Supreme Court in *Schad*
25  *v. Arizona.*  The defendant in *Schad v. Arizona* was charged with first degree murder
26  after the murder victim was found strangled to death in the underbrush along a highway
27  and petitioner was found in possession of some of the victim's belongings. *Id.* at 628.
28  Under the applicable state statute, first degree murder was defined broadly to include

- 16 -

1    murder that was committed by several different means.  For example, first degree
2    murder could be the result of premeditation.  It could also be "felony murder," such as
3    a murder that was committed during the perpetration of a robbery.  *Id.* at 629.  The
4    prosecutor's theory of the case included premeditated murder and murder in the
5    perpetration of a robbery.  *Id.*  The jurors were instructed that they must all agree
6    whether the defendant was guilty or not guilty.  *Id.*  The defendant was convicted of
7    first degree murder and sentenced to death.  *Id.*

8         To satisfy constitutional guarantees of due process, the defendant in *Schad v.*
9    *Arizona* argued that the jury should have been instructed that they had "to agree on one
10   of the alternative theories of premeditated and felony murder. . . ."  *Id.* at 630.  The
11   Supreme Court disagreed, stating that: "Due Process places no limits on a State's
12   capacity to define different courses of conduct, or states of mind, as merely alternative
13   means of committing a single offense, thereby permitting a defendant's conviction
14   without jury agreement as to which course or state actually occurred."  *Id.* at 632.  Due
15   process is satisfied as long as a statute does not "forbid conduct in terms so vague that
16   people of common intelligence would be relegated to differing guesses about its
17   meaning."  *Id.*  "If a State's courts have determined that certain statutory alternatives
18   are mere means of committing a single offense, rather than independent elements of the
19   crime, [Federal Courts] are not at liberty to ignore that determination and conclude that
20   the alternatives are, in fact, independent elements under state law."  *Id.* at 636.

21        Similarly, and as the California Court of Appeal concluded in petitioner's case,
22   a single burglary offense may be committed under California law by various means,
23   *i.e.*, by entering into various structures, such as a house, room, or apartment "with
24   intent to commit . . . any felony."  § 459.  Therefore, under *Schad v. Arizona*, it is
25   constitutionally insignificant that the jury in petitioner's case was not required to reach
26   agreement as to whether petitioner had the required intent when he entered the house
27   / / /
28   / / /

1  or when he entered a room within the house.[6] Either is sufficient to satisfy due process.

2  As a result, the California Court of Appeal's decision to deny petitioner's unanimity

3  claim was not contrary to clearly established Supreme Court precedent.

4       Petitioner also argues that the lack of a unanimity instruction made it possible

5  that the jury incorrectly believed his voluntary intoxication defense did not apply to the

6  Section 667.61(a)(c)(d) allegations.  [Doc. No. 1, Pet'n, at pp. 41-46.]  On direct

7  appeal, the California Court of Appeal rejected this argument.  The Court of Appeal

8  reasoned that the jury was specifically instructed that the voluntary intoxication defense

9  could be considered on the specific intent element of the burglary allegations under

10  Section 667.61(a)(c)(d) and presumably rejected that defense by finding the Section

11  667.61(a)(c)(d) allegations to be true. [Lodgment No. 9, at p. 24-25.]

12       A state prisoner seeking habeas relief based on instructional error must show that

13  "the ailing instruction by itself so infected the entire trial that the resulting conviction

14  violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  When a state

15  habeas petitioner claims that an instruction was omitted, the burden is "especially

16  heavy" because an omission is "less likely to be prejudicial than a misstatement of the

17  law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

18       As outlined more fully above, the omitted instruction on unanimity was not

19  required under California law or by clearly established Supreme Court precedent.  In

20  addition, as noted by the California Court of Appeal, the jury was specifically

21  instructed that they could consider evidence of voluntary intoxication on the issue of

22  specific intent. "The Court presumes that jurors, conscious of the gravity of their task,

23  attend closely the particular language of the trial court's instructions in a criminal case

24  and strive to understand, make sense of, and follow the instructions given them."

25

26  [6]       California law also does not require unanimity as to the felonious intent
    prong of the burglary statute.  In other words, the jurors are not required to reach a
    unanimous verdict as to exactly what felony the defendant intended to commit when
27  he or she entered a structure.  *Russo*, 25 Cal.4th at pp. 1132-1133.  If the evidence
    shows a single entry "but possible uncertainty as to the exact burglarious intent, that
28  uncertainty would involve only the theory of the case and not require a unanimity
    instruction." *Id.* at 1133.

1   *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985).  As a result, there is no basis for

2   concluding the jurors could have read the instructions in the manner suggested by

3   petitioner or that the absence of a unanimity instruction had any adverse effect on the

4   trial.  It is therefore clear that no due process violation occurred based on the absence

5   of a unanimity instruction.

6          Based on the foregoing, the California Court of Appeal's decision to deny

7   petitioner's claims of instructional error was not contrary to, nor an unreasonable

8   application of, clearly established Supreme Court precedent.   It is therefore

9   RECOMMENDED that the District Court DENY petitioner's claim of instructional

10  error in its entirety.

11         **D.    *Ineffective Assistance of Counsel.***

12         Petitioner believes his trial counsel was ineffective, because she pursued a

13  defense that had "no basis in law" and, in the process, caused irreparable harm to his

14  credibility.  [Doc. No. 1, Pet'n, at p. 32.] Apparently, defense counsel wanted to raise

15  a diminished capacity defense by introducing evidence showing that petitioner's use

16  of the drug ecstasy substantially impacted his mental state and ability to form the intent

17  necessary to commit some of the charged offenses.  When he testified before the jury

18  about engaging in sex acts with the victim while under the influence of ecstasy,

19  petitioner claims he did so in order to support this defense theory. However, petitioner

20  claims he would not have testified and exposed himself to a loss of credibility if he had

21  known there was no legal basis for the defense.   In addition, petitioner argues that his

22  counsel essentially conceded during argument that petitioner had the intent necessary

23  to complete the charged offenses.  According to petitioner, the prosecution's case

24  against him was not "airtight," so it is likely the jury would have reached a more

25  favorable verdict if his counsel did not pursue a baseless theory and he did not testify

26  to support this theory. [Doc. No. 1, Pet'n, at pp. 32-40.]

27         To prevail on a claim of ineffective assistance of trial counsel, a habeas

28  petitioner must show that "counsel made errors so serious that counsel was not

- 19 -                                      11cv1955-BTM(KSC)

1  functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland v.*
2  *Washington*, 466 U.S. 668, 687 (1984). "[T]he performance inquiry must be whether
3  counsel's assistance was reasonable considering all the circumstances." *Id.* at p. 688.
4  When considering all of the circumstances, counsel must be given "wide latitude . . .
5  in making tactical decisions." *Id.* at 689.  In other words, a reasonable tactical decision
6  cannot serve as the basis for a finding that counsel was constitutionally ineffective. *Id.*
7  In assessing an ineffective assistance of counsel claim, Federal Courts must also be
8  "highly deferential," avoid "the distorting effects of hindsight," and "indulge a strong
9  presumption that counsel's conduct falls within the wide range of reasonable
10  professional assistance." *Id.*

11      A habeas petitioner also cannot prevail on a claim of ineffective assistance of
12  counsel without showing that counsel's performance prejudiced the defense.  *Id.* at
13  687.  To establish prejudice, a defendant must demonstrate "there is a reasonable
14  probability that, but for counsel's unprofessional errors, the result of the proceeding
15  would have been different. A reasonable probability is a probability sufficient to
16  undermine confidence in the outcome." *Id.* at 694.  Because a defendant must prove
17  both elements of the *Strickland* test in order to prevail, a court may reject a claim of
18  ineffective assistance of counsel if it finds counsel's performance was reasonable, or
19  the claimed error was not prejudicial. *Id.* at 687.

20      On direct appeal, the California Court of Appeal assumed without deciding that
21  petitioner could prove deficient performance by counsel in pursuing a diminished
22  capacity defense.  However, the Court of Appeal rejected petitioner's ineffective
23  assistance of counsel claim because the evidence against petitioner was overwhelming
24  that he would be unable to establish prejudice.  As a result, the Court of Appeal
25  concluded it was not reasonably probable petitioner would have received a more
26  favorable result even if counsel did not pursue the diminished capacity defense.
27  [Lodgment No. 9, at pp. 32-35.]
28  / / /

1    Contrary to petitioner's argument, there is nothing to indicate that counsel's

2  voluntary intoxication offense had "no basis in law." [Doc. No. 1, Pet'n, at p. 32.]

3  Rather, the trial court concluded that voluntary intoxication was not a defense to the

4  general intent offenses charged, but voluntary intoxication could be considered by the

5  jury to determine whether petitioner was guilty of the charged offenses that required

6  a specific intent. [Lodgment No. 2, Tr., at pp. 7247-7248.] After considering defense

7  counsel's arguments, the trial court was convinced to instruct the jury, in part, as

8  follows:

9        You may consider evidence, as you find there to be such evidence, of
          [petitioner's] voluntary intoxication and only in a limited way and limited
10       purpose. You may consider that evidence only in deciding whether he
          acted with the intent of arousing, appealing to, or gratifying his own lust,
11       passion or sexual desires of himself or the child, and whether he intended
          to commit a lewd act upon a child under 14 years of age when he entered
12       an inhabited house, or room within the house.

13       A person is voluntarily intoxicated by willingly using any intoxicating
          drug, drink or other substance knowing that it could produce an
14       intoxicating effect, or willingly assuming the risk of that effect.

15  [Lodgment No. 2, Tr., at p. 7222.]

16    In support of the voluntary intoxication defense, petitioner testified that he

17  started experimenting with drugs as a teenager and had used cocaine, acid, ecstacy, and

18  methamphetamine. He said he also used methamphetamine mixed with alcohol and

19  ecstacy and testified about the powerful effects of his drug use. For example, petitioner

20  said he experienced blurred vision, intense sensitivity, being in a "dreamy stage" and

21  seeing "flashes of pictures" without being able to tell whether or not they were real.

22  He said, "Sometimes you see things that [are] not even there, and sometimes you

23  thought you were sleeping and dreaming but you're actually still sitting there and

24  you're up." [Lodgment No. 2, Tr., at pp. 6811-6818.] Petitioner further testified he

25  would hallucinate. [Lodgment No. 2, Tr., at p. 6824.]

26    Based on the circumstances described by petitioner in his testimony, it would not

27  be unreasonable for a trial attorney to question whether petitioner could have formed

28  the specific intent for some of the offenses charged and to pursue a diminished capacity

1  defense as to these particular offenses with the hope of obtaining an acquittal on at
2  least some of the charges. Naturally, petitioner's testimony would be the best evidence
3  of his mental state at the time in question. In support of this defense, petitioner's
4  counsel also offered expert testimony by a psycho-pharmacologist who studies the
5  effect of drugs on behavior. [Lodgment No. 2, Tr., at p. 6996.] This witness testified
6  about the powerful and overwhelming effects of taking the drug ecstasy, as well as
7  other street drugs and alcohol. [Lodgment No. 2, Tr., at pp. 7003-7017,7042-7048.]

8          In sum, the record does not support petitioner's contention that his trial counsel
9  was ineffective for pursuing a diminished capacity defense. Counsel's performance is
10  not deficient "simply because in hindsight the defense has proven to be unsuccessful."
11  *Cheney v. Washington*, 614 F.3d 987, 994 (9th Cir. 2010).

12          As noted above, petitioner also argues that his counsel was ineffective because
13  she essentially conceded during closing arguments that he had the intent necessary to
14  complete the charged offenses. In support of his argument, petitioner cites certain
15  pages of the trial transcript. [Lodgment No. 1, Pet'n, at p. 37, citing Lodgment No. 2,
16  Tr., at pp. 7281-7282, 7288, 7295.] He believes counsel's arguments indicated his
17  intent in using ecstasy was to gratify his lust and passion and achieve a love bond with
18  the victim, and this was essentially an admission on the issue of intent. However,
19  based on a review of the referenced pages and counsel's entire closing argument,
20  petitioner's contention lacks merit.

21          A review of the record indicates defense counsel's closing arguments were
22  adequate under the circumstances and could not reasonably be construed to concede
23  the element of intent. As this Court read's defense counsel's closing arguments, she
24  focused on several key points. One of counsel's arguments was that the victim's
25  testimony was not credible under the circumstances. [Lodgment No. 2, Tr., at
26  pp. 7278-7285, 7288-7290, 7293-7297.] Counsel also argued that defendant's
27  recollections about his contacts with the victim were not necessarily accurate because
28  he was under the influence of ecstasy and other substances at all relevant times and in

1 a "dreamy state" where sexual conduct could be fantasized or imagined. [Lodgment
2 No. 2, Tr., at pp. 7282-7283, 7291-7293.] Counsel's argument about petitioner's intent
3 was that it was not about actually having sex. Rather, his intent was simply to
4 experience the sensations, feelings, and fantasies that result from taking the drug
5 ecstasy and had nothing to do with the victim. The victim was simply present in and
6 around the home while petitioner and the other adults were drinking and taking drugs.
7 [Lodgment No. 2, Tr., at pp. 7285, 7287, 7298.] At most, counsel admitted that
8 petitioner appeared to have a bond with the victim and loving feelings toward her that
9 resulted from her presence at the home while he was partying there with her parents
10 and was under the influence of ecstasy. [Lodgment No. 2, Tr., at pp. 7287-7288, 7294-
11 7295.] Counsel's arguments could not reasonably be construed as a concession that
12 petitioner had the intent necessary to commit the charged offenses.

13       In keeping with the defense theory of the case, counsel also said, "This is a drug
14 that is very, very strong. It is so powerful it overcomes your free will. It is a drug that
15 sense of touch is increased. Your sensations are increased. It is a drug that makes you
16 react involuntarily in many different ways." [Lodgment No. 2, Tr., at pp. 7281, 7292,
17 7298.] Counsel also attempted to convince the jury that the physical evidence was not
18 credible evidence of guilt. [Lodgment No. 2, Tr., at pp. 7290-7291.] Therefore, this
19 Court cannot conclude after reviewing the record that counsel's closing arguments
20 were deficient, resulting in prejudice to the defense.

21       It is also clear based on a review of the record and the evidence as summarized
22 in the California Court of Appeal's unpublished opinion that petitioner would be able
23 to establish prejudice even if he could show counsel's performance was deficient. The
24 evidence shows that police did a thorough, careful investigation and uncovered very
25 convincing evidence that petitioner had  substantial sexual contact with the victim on
26 a number of occasions over a significant time period. This evidence was supported by
27 extensive testimony by the victim and other witnesses and by physical evidence.
28 [Lodgment No. 9, at pp. 2-5.] Adverse verdicts on all counts were therefore likely even

1    without petitioner's testimony.  As a result, the California Court of Appeal was correct

2    in concluding that petitioner would be unable to prevail on his ineffective assistance

3    of counsel claim, because he cannot establish prejudice under *Strickland*.

4         Based on the foregoing, the California Court of Appeal's denial of petitioners's

5    ineffective assistance of counsel claim was not contrary to, nor an unreasonable

6    application of, clearly established Supreme Court precedent.   It is therefore

7    RECOMMENDED that the District Court DENY petitioner's ineffective assistance of

8    counsel claim.

9         **E.    *Actual Innocence.***

10        Petitioner was found guilty by the jury of sexual intercourse with "a child who

11   is 10 years of age or younger" in violation of Section 288.7(a) (Counts 1, 3, and 5).  He

12   was also found guilty of oral copulation with "a child who is 10 years of age or

13   younger" in violation of Section 288.7(b) (Counts  7, 9, 11, and 13).  In addition,

14   petitioner was found guilty of sexual penetration of "a child who is 10 years of age or

15   younger" in violation of Section 288.7(b) (Counts 15 and 17). [Lodgment No. 1, Clk's

16   Tr., Vol. 4, at pp. 666-682.]

17        Petitioner contends his convictions under Sections 288.7(a) and (b) violate his

18   Federal constitutional right to due process, because he is "actually innocent" of these

19   offenses.  His argument is based on the language in these statutes which limits their

20   application to certain types of sexual offenses against "a child who is 10 years of age

21   or younger."  §§ 288.7(a)&(b).  According to petitioner, the victim was about 10 years

22   old plus about 5 months when the offenses occurred.  As a result, it is petitioner's

23   contention that Sections 288.7(a) and (b) do not apply, because the victim was actually

24   over the age of 10 years when the offenses occurred.  [Doc. No. 1, Pet'n, at p. 47-48.]

25        Petitioner raised this issue in his state habeas petitions.  The California Court of

26   Appeal rejected the claim because petitioner "failed to include any supporting

27   documentation, including transcript pages he cites in the petition." [Lodgment No. 15,

28   at p. 1-2.]

1    Petitioner's argument is easily rejected.  Federal habeas relief is available only
2  to state prisoners who are "in custody in violation of the Constitution or laws or treaties
3  of the United States." 28 U.S.C. §§ 2241, 2254.  Absent an independent Federal
4  constitutional violation, "it is not the province of a federal habeas court to re-examine
5  state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62,
6  68 (1991).

7    A habeas petitioner cannot "transform a state-law issue into a federal one merely
8  by asserting a violation of due process." *Langford v. Day*, 110 F.3d 1380, 1389 (9th
9  Cir. 1996).  Federal Courts generally accept a state court's interpretation of state law.
10  *Id.*  Therefore, alleging a possible "'variance with the state law'" is not enough to
11  constitute a Federal question on Federal habeas review.   *Little v. Crawford*, 449 F.3d
12  1075, 1083 n.6 (9th Cir. 2006) (internal quotations omitted).  "We cannot treat a mere
13  error of state law, if one occurred, as a denial of due process;  otherwise, every
14  erroneous decision by a state court on state law would come here as a federal
15  constitutional question." *Id.*  Moreover, the California Supreme Court recently
16  concluded that "ten years of age or younger" in a sex crime statute means "under 11
17  years of age" and therefore includes children who have reached their 10th birthday but
18  have not yet reached their 11th birthday. *People v. Cornett*, 53 Cal.4th 1261, 1275
19  (2012).

20    In sum, petitioner's "actual innocence" claim based on his constitutional right
21  to due process is not cognizable on Federal habeas review.   Therefore, it is
22  RECOMMENDED that the District Court DENY petitioner's claim that his right to due
23  process was violated based on his theory that he is actually or technically innocent of
24  violating Section 288.7.

25                          ***CONCLUSION***

26    For the reasons outlined above, IT IS HEREBY RECOMMENDED that the
27  Court issue an order (1) approving and adopting this Report and Recommendation;
28  and, (2) DENYING the Petition for Writ of Habeas Corpus.

1       IT IS HEREBY ORDERED THAT *__no later than June 17, 2013__*, any party may

2 file written objection with the District Court and serve a copy on all parties.  The

3 document should be entitled "Objections to Report and Recommendation."

4       IT IS FURTHER ORDERED THAT any reply to the objections shall be filed

5 with the District Court and served on all parties *__no later than June 21, 2013__*.  The

6 parties are advised that failure to file objections within the specified time may waive

7 the right to raise those objections on appeal of the District Court's order.  *See Turner*

8 *v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th

9 Cir. 1991).

10       IT IS SO ORDERED.

11 Date: _____, 2013

12

13

14                     KAREN S. CRAWFORD

United States Magistrate Judge

- 26 -